UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In the Matter of:

**LAKEVIEW VINEYARDS, LLC,**

Debtor.

Case No.
Chapter 12
Hon.

_____/

## DECLARATION OF DANIEL NITZ
## IN SUPPORT OF CHAPTER 12 PETITION

I, DANIEL NITZ, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a founding member and the managing member of Lakeview Vineyards, LLC ("Lakeview" or the "Debtor"). I serve as Lakeview's Chief Executive Officer and am responsible for its day-to-day financial operations.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management, the professionals assisting the Debtor, my review of relevant documents, and my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. The Debtor has authorized me to submit this Declaration on its behalf.

3. The Nitz family has farmed in Southwest Michigan for approximately five generations. Lakeview Vineyards, LLC was formed in 2014 by myself and my father James Nitz for the purpose of purchasing land for a vineyard and winery. Subsequently, Arrowhead Vineyards, LLC ("Arrowhead") was formed in 2015 by myself, my father James Nitz, and my mother Norma Nitz, for the purpose of growing wine grapes and operating a winery in Baroda, Michigan.

4. My father passed away in 2016, and his ownership interest was transferred to my mother. At present, Lakeview is owed 50% by myself and 50% by my mother, Norma Nitz. Arrowhead is

owned 67% by my mother, Norma Nitz, and 33% by myself. I am the active managing member of both entities. My mother is a passive owner and does not participate in daily operations.

5. Lakeview owns the real property which Arrowhead uses to operate the vineyard and winery. Lakeview's operations are closely integrated and intertwined with other affiliated entities, including Arrowhead Vineyards, LLC, Nitzco, LLC, Chill Hill, LLC, and Nitz Bev, LLC, which share common ownership and, in certain cases, common creditors.

6. The only creditors of Lakeview consist of shared obligations with Arrowhead.

7. I have always operated Lakeview in direct connection with Arrowhead as part of our ongoing family farm business operations. The entities are intimately tied together and operate as separate arms of the same farming operation.

8. In 2024, Greenstone Farm Credit Services ("Greenstone") refinanced and consolidated Lakeview's debt, taking over the existing mortgages.

9. At the time the Greenstone loans were made, Lakeview relied solely on the success of Arrowhead to make the loan payments. Arrowhead is a viable ongoing agricultural operation with a long-term plan centered on vineyard production, wine sales, and the gradual appreciation of vineyard real estate.

10. Lakeview has historically received payments intermittently from Arrowhead. There was no formal written lease agreement for the use of the Lakeview farming land. When funds were available from farming operations, Arrowhead would make payments to Lakeside from time to time. By way of example, Arrowhead made monthly rent payments to Lakeside during 2024 through June of 2025, in amounts between $1,400 - $1,800. Lakeside has not received rent payments since June of 2025. Any payments received by Lakeview from Arrowhead resulted directly from the farming operations and farming income of Arrowhead.

11. The financial operations of Lakeview and Arrowhead have always been closely related. Arrowhead has historically paid for shared creditor obligations, and has sometimes paid for property tax and insurance obligations for Lakeview's farm land. In addition, in the past, from time to time, Lakeview would keep funds in the bank account of Arrowhead as a de facto "savings" account – in order to keep funds set aside for future expenses. Lakeside had no ownership interest in these funds in these circumstances, and would then return the funds to Arrowhead when needed. I have historically often operated the two entities as extensions of each other. I understand that post-petition operations must, and will, be kept separate as required by the Bankruptcy Code.

12. The genesis of Lakeview's financial distress was precipitated primarily by a materially poor grape harvest in the growing season of 2024, and its resulting impact on Arrowhead. Because the two entities shared obligations, the financial issues experienced by Arrowhead directly impacted the financial situation of Lakeview.

13. Lakeview and Arrowhead are located in Southwest Michigan, a region that experienced significant agricultural challenges in 2024. The growing season was marked by adverse weather conditions, including damaging cold events and inconsistent weather patterns that negatively affected bud development, pollination, and yields across many vineyards in the region. As a result, grape yields in 2024 were substantially below normal historical levels.

14. Although Arrowhead maintained whole-farm crop insurance, that insurance did not fully replace the lost revenue associated with reduced grape production, particularly where lost yield also disrupted downstream wine production and sales cycles.

15. The reduced harvest materially impaired Arrowhead's cash flow during a period when debt service obligations to Greenstone were fixed and ongoing, which in turn directly affected Lakeview.

16. Compounding the 2024 crop failure, Arrowhead experienced a shortfall in anticipated wine sales through Nitz Wines, my collective wine brand. The operating projections presented to Greenstone at the time of refinancing assumed higher wine sales volumes than were ultimately realized.

17. While the crop insurance mitigated a portion of the direct agricultural loss, the combination of reduced grape availability and weaker-than-expected wine sales resulted in a significant revenue gap that Arrowhead could not overcome through cost reductions alone.

18. As a result of the 2024 crop failure and the associated revenue shortfall, Arrowhead and Lakeview were unable to remain current on their obligations to Greenstone.

19. Lakeview did not default due to mismanagement, diversion of funds, or speculative activity, but rather due to agricultural conditions and market realities inherent in farming operations.

20. Lakeview filed this Chapter 12 case in order to restructure its secured debt and preserve the going-concern value of a multi-generational family farming business that is directly tied to Arrowhead's ongoing Chapter 12 proceeding. Accordingly, Lakeview anticipates filing a motion to jointly administer the Chapter 12 cases of Lakeview and Arrowhead.

21. Chapter 12 provides a framework uniquely suited to agricultural enterprises such as Lakeview, allowing repayment of secured creditors over time at sustainable terms while preserving productive farmland and ongoing operations.

22. Lakeview does not anticipate filing an immediate cash collateral motion in this case. Lakeview does have its own bank account, but it does not currently contain significant funds. Further, any funds that it does, or will, hold post-petition are not required for immediate use and will remain in the bank account subject to any secured creditor liens. Lakeside does not have employees, and does not have any immediate obligations that must be paid. Property taxes are

currently due, which I anticipate will be paid shortly in due course pursuant to the approved cash collateral budget of Arrowhead. There is no immediate need for the use of cash collateral by Lakeview.

23. Lakeview's counsel will work directly with secured creditor counsel regarding any possible need for cash collateral use, and will enter into an agreement or file a motion if and when required.

24. Lakeview believes it can successfully reorganize under Chapter 12 and anticipates that market conditions will improve over time, allowing real property to be sold at values that permit full repayment of creditors while preserving family equity, which will provide Lakeview the opportunity to propose an anticipated jointly administered Chapter 12 plan with Arrowhead.

25. This Chapter 12 filing is necessary to preserve the value of Lakeview's estate, avoid irreparable harm, and provide the Debtor with a meaningful opportunity to reorganize for the benefit of all stakeholders.

26. If I were called to testify, I could and would testify competently to the facts set forth herein.

Dated: 2-25-26

/s/ Daniel Nitz
Daniel Nitz
Managing Member
Lakeview Vineyards, LLC